# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| KENNETH WYGAND, | ) |
| | ) C.A. No. S22C-02-004 CAK |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PRESIDIO, INC., | ) |
| | ) |
| Defendant. | ) |

Submitted:  March 20, 2025
Decided: March 24, 2025

*Upon Plaintiff's and Defendant's Cross-Motions for Summary Judgment
under Delaware Superior Court Civil Rule 56*

**PLAINTIFF'S MOTION DENIED
DEFENDANT'S MOTION GRANTED**

**<u>MEMORANDUM OPINION AND ORDER</u>**

Kenneth Wygand, Plaintiff, *Pro Se*.
10 Myles Court
Commack, NY 11725

Jason Z. Miller, Esquire and Kelly A. Green, Esquire, Smith, Katzenstein & Jenkins LLP, The Brandywine Building, 1000 N. West Street, Suite 1501, Wilmington, DE 19801, Attorneys for Defendant.

**KARSNITZ, R. J.**

**INTRODUCTION**

This is a straightforward breach of contract case. Nonetheless, it has been ongoing for more than four years and deals with events that occurred fourteen years ago. The time has come for this matter to be resolved and judgment to be entered with respect to this dispute surrounding what in my view is a clear and unambiguous contract.

Kenneth Wygand, a resident of New York ("Plaintiff") claims he was treated poorly, and he was. Presidio, Inc., a Delaware corporation ("Defendant") owed Plaintiff $834.90, which Defendant agreed was due on March 31, 2011, the date on which Defendant was sold in a cash-out merger. Remarkably, Defendant has not paid Plaintiff. It could have done so without prejudice, which at least would have stopped the accrual of interest on this amount. Everyone would have benefitted.

However, Plaintiff has transferred his mistreatment into a claim that he should have received a benefit to which he was not entitled, and which was only theoretically possible. I questioned him about this at oral argument, and he articulated no response other than that he was wronged, and that I should give him a windfall to offset the mistreatment.

Plaintiff's position is not in accordance with basic contract law. Plaintiff and Defendant had a contract, the Equity Participation Agreement (the "EPA").

Defendant acknowledges that it breached the EPA. Upon a sale and merger of Defendant, Plaintiff's equity rights were extinguished, and Plaintiff was given no new or additional equity rights. Rather, Defendant was required to make a cash payment to Plaintiff, as discussed in greater detail below. However, Plaintiff asserts that he is entitled to new or additional equity rights. I disagree. Rather, he is entitled to what he should have been paid in 2011 with interest at the legal rate.[1] That payment will make him whole, which is the goal of contract law in resolving claims for breach of contract.

## FACTS

Plaintiff is a former employee of Defendant, who commenced his employment with Defendant in 2007. During Plaintiff's employment, he received an Equity Participation Right ("EPR") pursuant to an Equity Participation Agreement dated March 5, 2008 (the "EPA"), representing 10,000 management common shares and 10,000 common shares. The management common shares and the common shares both had a Granting Value of $0.22 per share. The EPA defined Granting Value as the fair market value per share of the EPR shares as of the Grant Date, March 5, 2008. Assuming he remained employed with Defendant, Plaintiff's EPR vested at a rate of 25% each year from the Grant Date, e.g., on March 5, 2009, he was vested at 25%,

---

[1] 6 *Del. C*. § 2301(a).

3

on March 5, 2010, he was vested at 50% and so on, until fully vested in four years.

On June 2, 2010, Defendant (then a limited liability company) elected to be treated as a corporation for tax purposes and, in connection with that election, each 1,000 management common shares were converted to 518 common shares. Thus, Plaintiff's EPR equivalent was modified.[2] Based on this conversion, Plaintiff's EPR in connection with the 10,000 management common shares converted to an EPR represented by 5,180 common shares. Thus, Plaintiff had a total EPR equal to 15,180 common shares.

In December 2010, Plaintiff terminated his employment with Defendant. At that juncture, only 50% of Plaintiff's EPR had vested, i.e., he had an EPR tracking the fair market value of 7,590 of the 15,180 common shares.

On March 31, 2011, Defendant was sold in a cash-out merger. The merger agreement provided that both the vested and unvested portions of all equity-based awards would be cashed out. In other words, the equity underlying the EPRs no longer existed by virtue of the merger. As an equity-based award, Plaintiff's EPR was terminated, as were all other outstanding EPRs. Plaintiff's EPR was converted into the right to receive a cash payment in the amount of $0.33 per share less the Granting Value, which was $0.22 per share, or $0.11 per share. Multiplying that $0.11 per share by Plaintiff's 7,590 common shares yielded a cash payment amount

---

[2] This conversion was consistent with the EPA and has never been challenged by Plaintiff.

4

of approximately $834.90 due to Plaintiff.

Plaintiff's payment was calculated in accordance with Section 3 of the EPA entitled, "Payment for Equity Participation Right." Section 3(b) of the EPA provides that:

> In the event of a sale, a consolidation or merger of the Company or a sale of all or substantially all of the assets of the Company ("Sale") or in the event of a liquidation or dissolution of the Company, or a Company Public Offering (as defined in the Company's Second Amended and Restated Limited Liability Company Agreement, as amended from time to time, the "LLC Agreement"), the Board or board of managers or board of directors of any entity assuming the obligations of the Company, shall either (A) provide that this Equity Participation Right be continued by the Company or assumed by the acquiring or succeeding entity (or an affiliate thereof) and continue to vest in accordance with the terms thereof (including any accelerated vesting as provided in accordance with Exhibit A attached hereto), in which case this Equity Participation Right shall be exercisable (to the extent then vested on any such date) by the Grantee at any time through the Expiration Date for a cash payment equal to the Net Value, subject to the provisions of Section 3a, or *(B) provide that the outstanding Equity Participation Right shall be terminated (including both the vested and unvested portion thereof) in exchange for a cash payment equal to the Net Value of the vested portion thereof as of such date. For purposes of clause (B) the date of termination shall be the Date of Exercise.* [Emphasis supplied]

The Net Value to which Plaintiff was entitled is defined by Section 3(c)(A) of the EPA as "the amount, as of the Date of Exercise, by which the Exercise Value exceeds the Granting Value." Section 3(c)(B) then proceeds to define Exercise Value as "the fair market value per share of the Equity Participation Right Shares on the Date of Exercise as determined in good faith by the Board." Since Defendant was sold and

5

the acquiring entity did not assume the EPR, Section 3(b)(B) (emphasized above) is the applicable provision for determining the cash payment to which Plaintiff was entitled. Plaintiff is entitled to a cash payment equal to the Net Value of his vested EPR. As stated above, Net Value is calculated as follows: the Exercise Value ($0.33 per share) as determined in accordance with the merger sale price minus the Granting Value ($0.22 per share) and multiplying that amount ($0.11 per share) by Plaintiff's vested 7,590 common shares. Multiplying that $0.11 per share by 7,590 common shares yields a cash payment amount of approximately $834.90.

An employee of Defendant misconstrued the provisions of the EPA and erroneously believed that Plaintiff's voluntary termination of his employment resulted in the forfeiture of his entitlement to payment for the EPR. Due to this clerical error, Plaintiff did not receive a cash payment for the value of his EPR.[3]

On December 19, 2017, Plaintiff contacted Defendant to inquire as to the procedure for obtaining payment in connection with his EPR. Defendant informed Plaintiff that his EPR was worth an $834.90 payment but offered Plaintiff a payment in the amount of $1,669.90 to make up for the clerical error made by Defendant.[4] Plaintiff was unwilling to accept that payment in full satisfaction of a judgment. Instead, Plaintiff maintains he is entitled to the amount of $139,959.60,

---

[3] Compl. ¶ 21; Answer ¶ 21.
[4] This amount would have provided Plaintiff with a compounded rate of interest exceeding ten percent at the time the offer was made.

which he claims represents the fair market value of the shares at the close of the stock market trading day on December 19, 2017.

## PROCEDURAL BACKGROUND

On September 11, 2020, Plaintiff filed a Verified Complaint ("Complaint") in the Court of Chancery against Defendant. Plaintiff's Complaint contained two counts – one for breach of contract and one for violation of shareholder rights. Defendant moved to dismiss the Complaint for a lack of subject matter jurisdiction and moved to dismiss the shareholder rights claim for failure to state a claim. Briefing ensued, and the Court of Chancery held oral argument on January 6, 2022, and dismissed Plaintiff's shareholder rights claim pursuant to Rule 12(b)(6) and found that it lacked subject matter jurisdiction over the contract claim. The Court of Chancery gave Plaintiff leave to transfer his contract claim to Superior Court and the action was transferred to this Court in February 2022.

Defendant filed its Answer to the Superior Court Complaint on March 31, 2022. On September 7, 2022, Defendant moved for judgment on the pleadings pursuant to Superior Court Civil Rule 12(c). Plaintiff filed an opposition to the motion dated October 31, 2022, and an amended opposition dated November 10, 2022. Defendant filed its reply on December 7, 2022.

On January 5, 2023, the parties submitted a joint letter to the Court that requested the Court issue a new pretrial scheduling order that extended all existing

deadlines by six months. On January 9, 2023, the Court approved the extension.

On March 3, 2023, the Court held oral argument on Defendant's motion for judgment on the pleadings. The Court denied Defendant's motion and ordered Plaintiff to contact Defendant's counsel within twenty days to attempt to reach agreement on whether discovery was necessary in this action and, if not, to agree on a briefing schedule for dispositive motions.

On March 13, 2023, the parties submitted a joint letter to the Court apprising the Court of each parties' respective positions with respect to whether discovery in this action was warranted. On March 14, 2023, the Court issued a letter ruling that the parties were allowed limited discovery of document requests and interrogatories to twenty per party and depositions to one per party.

The parties conferred and submitted a schedule to govern discovery and summary judgment briefing on March 21, 2023. On June 2, 2023, the Court entered the parties' proposed schedule. On July 10, 2023, Plaintiff served requests to produce documents and interrogatories. Defendant timely served its responses and objections to the discovery on August 9, 2023. The next day, Defendant produced documents to Plaintiff. Wygand took two depositions in this action. On March 1, 2024, the Court ruled that no more depositions would be conducted and advised the parties that they could move forward with dispositive motions. On March 7, 2024, Plaintiff asked for reconsideration of the Court's ruling and on March 11, 2024,

Defendant opposed reconsideration, On March 19, 2024, the Court allowed Plaintiff one more deposition.

On July 1, 2024, the Court entered a Second Pretrial Scheduling Order which, inter alia, provided that the pretrial stipulation would be due on March 27, 2025, and the pretrial conference was scheduled for April 2, 2025, with trial to follow.

On September 13, 2024, Defendant filed its Motion for Summary Judgment. On November 15, 2024, Plaintiff filed both an Answer to Defendant's Motion for Summary Judgment and his Cross-Motion for Summary Judgment. On December 5, 2024, Defendant filed its Reply to Plaintiff's Answer and its Opposition to the Cross-Motion for Summary Judgment. On January 13, 2025, Plaintiff filed his Reply. I held oral argument on the cross-Motions for Summary Judgment on February 11, 2025.

On February 25, 2025, Defendant filed its letter with respect to the calculation of prejudgment interest. On March 3, 2025, Plaintiff filed an unsolicited letter on a variety of topics, and on March 17, 2025, Plaintiff filed his letter with respect to the calculation of prejudgment interest. On March 19, 2025, Defendant filed its response to Plaintiff's unsolicited letter.

On March 20, the parties requested a clarification of the Second Pretrial Scheduling Order, and that same day the Court entered an Order holding all dates in abeyance until the issuance of this opinion. This is my opinion on the cross-Motions

for Summary Judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate when the moving party demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.[5] In reviewing a motion for summary judgment, I view the facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party.[6] Once the moving party establishes that there are no material factual issues in dispute, the non-moving party bears the burden of demonstrating a material factual issue by offering admissible evidence.[7] The non-moving party may not simply rest on unverified allegations or unsupported statements of fact in a brief.[8] "The purpose of Superior Court Civil Rule 56 is to provide a method by which issues of law involved in a litigation may be speedily brought before a trial court and disposed of without unnecessary delay. 'The disposition of litigation by motion for summary judgment should, when possible, be encouraged for it should result in a prompt, expeditious and economical ending of lawsuits.'"[9]

---

[5] Del. Super. Civ. R. 56(c); *Moore v. Sizemore,* 405 A.2d 679, 680 (Del. 1979).
[6] *DiOssi v. Maroney,* 548 A.2d 1361, 1362 (Del. 1988).
[7] Del. Super. Civ. R. 56(e); *Phillips v. Del. Power & Light Co.,* 216 A.2d 281, 285 (Del. 1966).
[8] Super. Ct. Civ. R. 56(e); *Martin v. Nealis Motors, Inc.*, 247 A.2d 831, 832 (Del. 1968); *Standard Accident Ins. Co. v. Ponsell's Drug Stores, Inc.*, 202 A.2d 271, 276 (Del. 1964); *Tanzer v. Int'l Gen. Indus., Inc.*, 402 A.2d 382, 385 (Del. Ch. 1979).
[9] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 443 (Del. 2005) (internal citations omitted).

When, as here, the parties file cross-motions for summary judgment and do not argue that there is a material issue of fact, the court will treat the motions as a stipulation for a decision on the merits based on the record submitted with the motions.[10] The court must examine each motion separately, applying the same standard to each. The existence of cross-motions does not necessarily indicate that summary judgment is appropriate for either party. Each party must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law.[11] Filing a cross-motion for summary judgment does not waive a party's right to assert that there are disputed facts that preclude summary judgment in favor of the other party. Each party concedes the absence of a factual issue and the truth of the nonmoving party's allegations only for the purposes of its own motion.[12] Even when presented with cross-motions, the court must deny summary judgment if a material factual dispute exists. The court must view the facts in the light most favorable to the nonmoving party and determine if the record requires further development to clarify the law or its application to the case.[13]

---

[10] *Farmers for Fairness v. Kent County*, 940 A.2d 947 (Del. 2008); *Waters v. Delaware Moving and Storage, Inc.*, 300 A.3d 1 (Del. 2023).

[11] *Bernstein v. TractManager, Inc.*, 953 A.2d 1003 (Del. 2007); *Fasciana v. Electronic Data Systems Corp.*, 829 A.2d 160 (Del. 2003).

[12] *Waters v. Delaware Moving and Storage, Inc.*, *supra*; *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043 *(*Del. 2001).

[13] *Fasciana v. Electronic Data Systems Corp.*, *supra*; *Comet Systems, Inc. Shareholders' Agent v. MIVA, Inc.*, 980 A.2d 1024 (Del. 2008).

## ANALYSIS

## Summary Judgment

In my view, Defendant has satisfied the standards for summary judgment. Defendant has demonstrated that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law, even though I have viewed the facts in a light most favorable to Plaintiff and drawn all reasonable inferences in favor of Plaintiff. Plaintiff has not borne the burden of demonstrating a material factual issue. It cannot simply rely on mere allegations or conclusory statements of fact. This resolution of the case will allow issues of law to be promptly, expeditiously and economically resolved.

## Breach of Contract and Monetary Relief

Plaintiff argues that the proper Date of Exercise for his EPR was not March 31, 2011, the merger date, but rather December 19, 2017, the date on which Plaintiff requested to exercise his EPR and Defendant denied Plaintiff's request. Since Defendant failed to follow the procedures for cashing out Plaintiff's EPR in accordance with the provisions of the EPA (a failure conceded by Defendant), and since Plaintiff was unaware of such failure and the purported termination of his EPR, such failure in effect negated the termination of his EPR until he sought to exercise it six years later. In something akin to an equitable estoppel argument, Plaintiff asserts that his EPR remained intact until Plaintiff's

request to exercise it in 2017.

The specific failure pointed to by Plaintiff was Defendant's failure to include his EPR in the membership interest schedule provided to the Board of Directors of Defendant as a part of the merger consideration. This omission, argues Plaintiff, means that the Board of Directors never could have made the required determination under Section 3(b)(B) of the EPA, discussed above, to either terminate or continue his EPR. Had it had the opportunity to do so, it could have continued his EPR rather than terminating it.

Plaintiff misreads the clear and unambiguous language of Section 3(b)(A) and Section 3(b)(B) of the EPA. Defendant's choice upon the merger was either to continue the EPRs after the merger under Section 3(b)(A) of the EPA or to terminate the EPRs after the merger under Section 3(b)(B) of the EPA. The merger agreement itself clearly and unambiguously chose the latter – to terminate *all* the EPRs for a cash payment to *all* holders of EPRs, including Plaintiff. Section 3(b)(B) of the EPA clearly and unambiguously states that the EPR is terminated and replaced by the right to a cash payment, i.e., an equity right is replaced by a liquidated cash equivalent. It is true that the cash payment was never tendered by Defendant or received by Plaintiff, and that this was Defendant's fault. But this does not mean that, because of such fault, Plaintiff continued to have some sort of inchoate equity interest *ad infinitum* into the future

until he chose to cash it out.

Another fallacy in Plaintiff's argument is that he is asserting an equity interest in an entity that no longer exists. The entity in which Plaintiff was given an EPR has long ago been merged and sold. Even if Plaintiff theoretically had an equity interest (which he no longer does), an equity interest in nothing is nothing. That equity interest was long ago converted to the right to a cash payment.

As to Plaintiff's assertion that the proper Date of Exercise was December 19, 2017, the fact that he chose that date to request his cash payment does not change the clear and unambiguous terms of Section 3(b)(B) and Section 3(c)(A) of the EPA and the merger agreement. Unlike a magician, Plaintiff cannot simply pick a date and make it the Date of Exercise in contravention of the contract documents.

Similarly, Plaintiff cannot contravene the detailed terms of the EPA for calculating the value of the vested and unvested portions of the EPR, including Section 3(b)(B) and Section 3(c)(A) of the EPA, by the self-serving statement that his EPR should be valued based on the fair market value of Defendant's stock on December 19, 2017, the date of his exercise request. One can appreciate Plaintiff's attempt to astronomically increase the amount of the cash payment but simply wishing for something does not make it true.

## CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's Cross-Motion for Summary Judgment is **DENIED**. Defendant shall pay Plaintiff the sum of $834.90, plus prejudgment interest thereon from the date of March 31, 2011, until the date of this judgment at the rate of 5% over the Federal Reserve discount rate, compounded quarterly.

**IT IS SO ORDERED**.

/s/ Craig A. Karsnitz
Craig A. Karsnitz

cc:    Prothonotary